Filed 12/14/15  In re A.G. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re A.G., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E063365 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ108028) |
| v. | OPINION |
| A.G. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Jacqueline C. Jackson, Judge.  Affirmed.

Karen J. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant A.G.

Merrill Lee Toole, under appointment by the Court of Appeal, for Defendant and Appellant E.G.

1

Gregory P. Priamos, County Counsel, and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

Appellants E.G. (grandmother) and An.G. (father) are the paternal grandmother and father, respectively, of the minor Am.G. (child), the subject of this dependency matter. Grandmother appeals the court's ruling with respect to her Welfare and Institutions Code[1] section 388 petition, which had asked that the court "review the placement decision" of plaintiff and respondent Riverside County Department of Public Social Services (DPSS); the child had been placed with a nonrelative foster family instead of with the parental grandparents. The trial court agreed to review its prior decision, but denied the implicit request to change the child's placement.[2] Father appeals from the judgment terminating his parental rights, contending that the juvenile court should have found applicable the beneficial parental relationship exception to termination of parental rights, codified at section 366.26, subdivision (c)(1)(B)(i). We affirm.

I. FACTS AND PROCEDURAL BACKGROUND

The child most recently came to the attention of DPSS on July 8, 2013, when a social worker was called to the scene of a car accident involving the child (born

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

[2] The section 388 petition at issue was filed on behalf of both paternal grandparents, as was the notice of appeal. Nevertheless, the paternal grandfather has made no appearance here, with briefing filed solely on behalf of grandmother. In the interest of brevity, because the child's maternal grandparents need not be discussed, in this opinion we will refer collectively to the paternal grandparents simply as "grandparents."

2

September 2009) and her mother and father.[3]  The detention petition, filed July 10, 2013, states that the child's mother was killed in the accident, which occurred when she passed out while driving and struck a parked vehicle.  After the accident, father took the child, who had not been secured in a car seat but was uninjured, into the bathroom of a house near the accident scene, where he used heroin in the child's presence.  Father was subsequently arrested and charged with being under the influence, possession of a hypodermic needle, and child endangerment.  The child was detained and placed in a foster home.[4]

In a July 8, 2013, interview with the social worker, father denied that he had used drugs after the car accident, claiming the last time he and mother had used drugs was July 7, 2013.  Father said he had used drugs since he was 16 or 17 years old, and that he had never completed a drug treatment program in the past.  He named heroin as his drug of choice (though he had also used methamphetamine) and described his usage of heroin as twice per day, $20 worth each time.  He reported his last arrest had been about three weeks before, for heroin possession.  Father had a criminal history that included grand theft and multiple arrests and convictions for drug-related offenses.

On July 9, 2013, grandmother called the social worker, inquiring about the child and asking for a visit, which was arranged for the same day.  The social worker observed the child to be very happy to see her grandparents.  The grandmother indicated they

_____

[3]  A previous referral with respect to the child had been closed as unfounded.

[4]  The child's half brother, then aged 17, was also detained, but he is not a part of this appeal.

3

would be willing to take placement of the child. She said their younger son lived with them, and initially denied any past arrest or criminal history. When informed that they would have to submit to a background check, however, the grandmother informed the social worker the grandfather had been arrested several years before. The grandparents agreed to contact the social worker the next day to start the "RAU [Relative Assessment Unit] process."

At the July 11, 2013, detention hearing, the trial court found a prima facie case for detention. Father was granted supervised visitation a minimum of once per week. The court authorized assessment of grandparents for placement of the child, and also authorized them to have frequent visitation.

A background check conducted in July 2013 revealed that both grandparents had previously been arrested on deportation charges. Also, a "location hit 311.1(A)" was found for grandparents' home, and they were asked to verify when they had moved into the home.[5] Because of the grandparents' arrests, DPSS was unable to place the child with the grandparents on an emergency basis, but the social worker anticipated placement of the child there, once the home was certified.

On August 1, 2013, the court found that the child came within section 300, subdivision (b). The child was removed from father's custody, and father was granted reunification services.

---

[5] This refers to Penal Code section 311.1, subdivision (a), which criminalizes the publication or distribution of child pornography.

4

The child was placed with grandparents on November 8, 2013. Prior to placement with grandparents, father had weekly visitation with the child. In a status report filed January 16, 2014, the social worker described father as "compliant with his visitation and consistent with the scheduling of the visits," and found that he "talked to [the child] in an appropriate and loving manner, and interacted with her positively." During this time, grandparents also had overnight visits with the child several nights per week. Once the child was placed with grandparents, they were permitted to supervise father's visits in their home; this visitation was viewed by the social worker as "positive and beneficial for all parties." The social worker observed that the child was bonded to father, and that father was successfully demonstrating an ability to maintain a bond with her by calling her and visiting on a frequent basis.

On February 3, 2014, the court continued reunification services, and found the child's placement with grandparents to be appropriate. The court authorized liberalization of visits with father, including overnights, weekends, and placement with family maintenance services. By March 2014, DPSS supported placement of the child with father, but father delayed her return, demonstrating stress about dealing with her care, despite having completed a parenting education course, and he had "not been compliant with [DPSS] in the implementation of the in-home parenting education program, Safe Care."

On June 4, 2014, the child was returned to the care of father. Several grounds for concern regarding placement with grandparents had arisen over the previous several months. Among other things, on one occasion, in February 2014, a visiting social worker

5

found the child outside the home unsupervised, in pajamas. The grandfather became "very testy" when asked about the situation by the social worker. The social worker also noted that the child, who had been more bubbly and friendly previously, had become more guarded; the social worker observed the family to be "private," and there had been influence on the child to be the same. Indeed, on at least two occasions, the child indicated she had been instructed not to speak to the social worker. Additionally, the child had an initial mental health assessment on April 29, 2014, and had been scheduled to attend several sessions of counseling, but grandparents had refused to take her, believing she did not need any intervention. DPSS's concerns culminated with removal after DPSS learned grandparents had allowed a son of theirs who is a registered sex offender to move into the home.

At the time the child was returned to father's care, DPSS understood that he was living with his brother and the brother's family, but was working and planned on finding a home for himself. On August 4, 2014, the court ordered family maintenance services, and placement with father.

On August 21, 2014, DPSS filed a section 387 petition to remove the child from father's care; on August 19, 2014, the child had been detained by DPSS. DPSS alleged that father had relapsed, and had admitted to using methamphetamine and heroin for the past couple of months. Although father had claimed he was living with the child in the home of his brother and his family, he was actually staying with friends; he had become depressed around the anniversary of the accident, and he was also having trouble dealing with the child. On August 19, 2014, the social worker received a call from grandmother,

6

asking that the child be placed back in their home. The grandmother confirmed, however, that the registered sex offender uncle of the child still lived in the home. DPSS placed the child with a nonrelative foster family.

In a jurisdiction/disposition report filed September 11, 2014, DPSS noted that the grandparents had again been considered for placement of the child, but DPSS recommended against it, noting that the grandparents home environment "is the same as when [DPSS] had to remove the child previously . . . ." The grandparents had stated they were selling their home and planned to move in October 2015, and that all of their adult sons would have to find their own residences. The social worker remained concerned, however, about several previous incidents showing lack of adequate supervision of the child, as well as the grandparents' resistance to counseling for the child. The grandparents also confirmed that they had directed the child not to disclose information to the social worker, and the social worker observed that, while in the care of the grandparents, the child had "quickly changed from a vivacious, talkative, young girl to a close mouthed one who would look at [the social worker] in a fearful manner whenever [the social worker] came to talk to her."

In an addendum report, filed October 1, 2014, DPSS reported that the grandparents visited with the child three times in August and September 2014. The child was upset after the first visit, but showed no distress after the other visits. The child told her foster mother about incidents that had happened when she lived with the grandparents, "such as, being spanked with a belt and the lack of a car seat when she was being transported anywhere." Father had visited with the child once, in August 2014, and

7

had another visit scheduled for October 2, 2014. The social worker observed, however, that father appeared to be "unable or unwilling to reunify with his child at this time and is hoping that his parents will be able to care for [the child] despite the concerns [DPSS] has communicated to [father]."

In an addendum report, filed November 20, 2014, DPSS reported that father was currently participating in the family preservation program, after initially missing a drug test and failing to appear for a drug court hearing. Father was having "uneventful" weekly visits with the child. DPSS recommended family reunification services be denied to the father, because he had already had 12 months of services, and that the child remain in foster care, with a permanent plan of adoption.

On December 1, 2014, grandmother's section 388 petition was filed. The juvenile court set the petition for hearing.

On December 2, 2014, after a contested hearing, the juvenile court sustained the section 387 petition, terminated services to father, reduced his visitation, and set a section 366.26 hearing.

On January 8, 2015, DPSS filed an addendum report in response to the section 388 petition. DPSS recommended that the child remain in her current placement with a nonrelative foster family, reiterating concerns previously expressed regarding the grandparents' home. The social worker also noted that the current placement was with caregivers who were willing and able to adopt the child, and would be willing to "foster an ongoing relationship between the father, paternal grandparents, and [the child], if it is of positive benefit for her."

8

On March 17, 2015, DPSS filed a combined section 366.26 and section 366.3 report, recommending termination of parental rights and adoption by the child's current caregivers. The report noted that father had regularly visited with the child as permitted by DPSS and court order since September 2014, as did grandparents; the visits were supervised by the foster parents. On one occasion, however, the grandparents came to a visit that was scheduled just for father; the foster parent "felt [the grandparents] were very hostile towards him during the visitation." The visits were subsequently moved to the DPSS office.

In an addendum report filed March 20, 2015, DPSS reported that the child and her current caretakers/prospective adoptive parents were developing an attachment to each other, and that the child also was developing a strong bond with the prospective adoptive parents' extended family members and community. The prospective adoptive parents were "dedicated and ready" to adopt the child, and the child was "thriving" in their home. Her personality was once again "happy, outgoing, and talkative." The child indicated that she loved, and wanted to live with her current caretakers, who she called "moma bear" and "papa bear," though she still had attachments to her father and grandparents. She stated that she liked seeing her father, and that they play together. The prospective adoptive parents did not want to enter into a postadoption contact agreement, but were willing to maintain occasional supervised visitation, "as long as [the child] remains safe and continues to benefit from the relationship [with] her birth father."

On March 24, 2015, the juvenile court held a hearing on the section 388 petition. Grandmother and father testified at the hearing. Grandmother testified, inter alia, that

9

grandparents had moved and were staying with friends while a house was being built in Lake Elsinore. She stated that she continued to have contact by telephone and outside the home with her son who is a registered sex offender, although he no longer lived with them. She agreed that she had previously chosen not to follow DPSS directives to take the child to counseling, because she did not want the child to remember what happened in the accident, but indicated that she was willing to take the child to counseling now. She indicated that she would do anything the court ordered, if the child was placed with her, and that she was prepared financially and otherwise to meet all of the child's needs. She testified that she had a close bond with the child, and would be devastated if the court did not grant the motion and place the child with her.

Father supported grandparents' petition "[o]ne hundred percent." He observed that they had always been involved in the child's life, and he had no doubts about their ability to care and provide for her. He believed that grandparents would be protective and loving toward the child, and observed a strong, reciprocal bond between them. He characterized the failure to follow through with counseling for the child as a "misunderstanding."

The juvenile court denied the section 388 petition, acknowledging that they love the child and are financially capable of supporting her, but finding that they "seem to lack any protective capacity." The court believed that grandparents had encouraged the child "to keep secrets from the social worker, to basically cover different things that were happening in the home that were not appropriate, which risks her safety," as well as damaging grandmother's credibility. The court doubted grandparents' ability to "live

10

differently in a way that's going to be fully protective of [the child] and completely put her needs first." On that basis, the court found the current placement to be appropriate, and placement of the child with grandparents would not be in the child's best interest.

On May 6, 2015, father filed a section 388 petition, requesting either family maintenance or family reunification services. That petition was heard on May 7, 2015, concurrently with section 366.26 issues. Father testified that he had been sober since September 8, 2014, and had enrolled in school. He had completed parenting classes, was participating in Narcotics Anonymous/Alcoholics Anonymous, had a sponsor, had submitted to random drug testing, and had secured housing. He had visited with the child regularly, once per month as allowed by court order, and he believed that he had a bond with the child. With respect to section 366.26 issues, counsel for father objected to termination, arguing that the beneficial parental relationship exception to adoption, codified at section 366.26, subdivision (c)(1)(B)(i), applied.

The juvenile court denied father's section 388 petition, finding father had demonstrated "changing, [but] not yet changed" circumstances, and that it was not in the child's best interest to return or offer additional services to father. The court court found that no exception to adoption applied, and terminated father's parental rights. With respect to the beneficial parental relationship exception, the trial court found father had been "mostly consistent in visitation," and acknowledged that the child was bonded with father. Nevertheless, the child had "clearly also bonded" with the prospective adoptive parents. The court found that the benefits of the bond between father and daughter did not outweigh the benefits the child would gain through adoption.

11

## II. DISCUSSION

## A. The Trial Court Did Not Abuse Its Discretion by Denying Grandmother's Section 388 Petition.

Grandmother contends the trial court abused its discretion by declining to change its previous order placing the child with nonrelative foster parents. We find no abuse of discretion.

"Section 388 permits '[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court' to petition 'for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court' on grounds of 'change of circumstance or new evidence.' (§ 388, subd. (a).)" (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 912.) "The parent bears the burden to show both a "'legitimate change of circumstances"' and that undoing the prior order would be in the best interest of the child." (*In re S.J.* (2008) 167 Cal.App.4th 953, 959.) "The petition is addressed to the sound discretion of the juvenile court, and its decision will not be overturned on appeal in the absence of a clear abuse of discretion." (*Id.* at pp. 959-960.) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 (*Stephanie M.*).)

Here, the juvenile court agreed to grandparents' request that it "review the placement decision" placing the child with nonrelative foster parents, instead of with them. It found, however, that the current placement was appropriate, and denied the

12

section 388 petition with respect to changing the previous placement order, finding that to make the requested change in placement would not be in the child's best interest. We cannot say that this decision was an abuse of discretion. As discussed above, there was evidence (only some of which was even disputed) that while the child was in their care, grandparents exhibited poor judgment in a number of respects, including their initial refusal to take the child to counseling as ordered, a lack of supervision leading to the child being found outside the home unsupervised by the social worker, inappropriate physical discipline of the child, their instructions to the child to keep secrets from the social worker, and their decision to allow a registered sex offender to move into the home. There was some evidence of the child being transported by car without being secured in an appropriate restraint—a particularly appalling lapse, given the circumstances that gave rise to this dependency. While in their care, a seemingly happy, talkative, and open child became fearful and closed mouthed in the presence of social workers; once removed to foster care, she once again became cheerful and vivacious. To say that the trial court had ample grounds to conclude that placing the child with grandparents would not be in the best interest of the child is something of an understatement.

Grandmother's arguments to the effect that grandparents were an "appropriate" placement, or had never been found "unsuitable" for placement, miss the mark. The issue is not whether grandparents were an appropriate placement, but whether the decision not to place the child with them was outside the bounds of reason.

13

(*Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319.) For the reasons discussed above, it was not.

Grandmother further argues that "the grandparents were entitled to preferential consideration for placement," pointing to section 361.3, and contending that DPSS "clearly failed to consider the grandparents first, as it was required to do," when the child was removed from father in August 2014. The record demonstrates, however, that DPSS *did* consider grandparents first for placement, but decided it would be inappropriate, because the grandparents home environment was "the same as when [DPSS] had to remove the child previously . . . ." Among other things, grandmother informed the social worker on August 19, 2014, that a registered sex offender (her son) still lived in their home. As discussed above, however, while the presence of a sex offender in the home triggered the previous removal, a number of other issues, raising questions about whether placement with grandparents was in the child's best interest, had arisen previously. Preferential consideration under section 361.3 does not entitle a relative to any presumption that placement with the relative is in the child's best interest. (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 320-322.) Even if there were such a presumption, however, DPSS would have been well justified in concluding the presumption had been outweighed by other factors.

Grandmother further objects that the child was removed by DPSS, without any section 387 petition being filed. No section 387 petition, however, was required for DPSS to remove the child from their care under the general placement order then in effect. (See *In re Cynthia C.* (1997) 58 Cal.App.4th 1479, 1482 ["When a general

14

placement order vests [DPSS] with the minor's custody and the discretion to select suitable placement, the agency may, without further court order, react to changed circumstances by removing the child from an environment it deems no longer suitable and selecting another placement."].)

Finally, grandmother asserts that the court failed to consider the child's best interest in making its decision. This argument is belied by the record, as the court explicitly based its decision on what it viewed to be the child's best interest. As discussed above, this decision was not outside the bounds of reason, so must be affirmed.[6]

## B. Trial Court Did Not Err by Declining to Apply Beneficial Parental Relationship Exception.

Father contends that the trial court should have applied the beneficial parental relationship exception to adoption, codified at section 366.26, subdivision (c)(1)(B)(i), instead of terminating his parental rights. We find no error.

---

[6] We pause here to remind counsel for grandmother of her duties as an officer of the court, which include a duty of candor. (Bus & Prof. Code, § 6068, subd. (d); Rules Prof. Conduct, rule 5-200.) When counsel writes that the court "never mentioned [the child's] best interests," and then cites to a page of the reporter's transcript where the court *explicitly* considers the child's best interests ("[T]he decision for [the child's] current placement is appropriate, and it's not in her best interest to change it") counsel breaches the duty of candor. Similarly, when counsel writes "there is no evidence that [the child] 'loved' [her prospective adoptive parents] or that they 'loved' her," counsel simply misstates the record, as the social worker explicitly noted that the child "states that she loves [the prospective adoptive parents] and wishes to be adopted by them," and that the prospective adopted parents were focused on "providing a stable, loving home where [the child] can feel valued and safe." Counsel would be well advised to adhere strictly to her professional duties, including the duty of candor, in any further proceedings before this court.

15

At a section 366.26 hearing, the juvenile court determines a permanent plan of care for a dependent child. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) Adoption is the preferred permanent plan because it is more secure and permanent than legal guardianship or long-term foster care. (*Ibid.*) "Adoption must be selected as the permanent plan for an adoptable child and parental rights terminated unless the court finds 'a compelling reason for determining that termination would be detrimental to the child . . . .'" under one or more of the exceptions set forth in section 366.26, subdivision (c)(1)(B). (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 (*Bailey J.*).) One such exception is the beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i).)

To establish the beneficial parental relationship exception to termination of parental rights, a parent has the burden of showing "both regular visitation and contact [with the child] and the benefit to the child in maintaining the parent-child relationship." (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80-81; see § 366.26, subd. (c)(1)(B)(i).) With respect to the "benefit to the child" prong of the exception, a beneficial relationship is one that "'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'" (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534.) The parent has the burden of demonstrating that "severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed . . . ." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

16

We apply the substantial evidence standard of review to the trial court's factual determinations, including the issue of regular visitation and contact with the child, and the existence of a beneficial parental relationship.[7] (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.) When the party with the burden of proof appeals, contending the trier of fact erred in concluding that party failed to meet his or her burden, the question on appeal "becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) Accordingly, "a challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.'" (*Bailey J.*, *supra*, at p. 1314.)

The record here does not compel a finding in favor of father. The court found that father had visited consistently with the child, and that there was a bond between him and the child. But the evidence does not compel the conclusion that the benefits of that bond so promoted the well being of the child as to outweigh the benefits of adoption. Although the child knew father and enjoyed spending time with him, he at least arguably had no parental relationship with her, as opposed to that of a friendly visitor. (See *In re Angel B.* (2002) 97 Cal.App.4th 454, 468 [for exception to apply, "the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative . . . ."].) In 2014, father delayed

---

[7] The determination of whether the existence of that relationship constitutes "'a compelling reason for determining that termination would be detrimental to the child" within the meaning of section 366.26, subdivision (c)(1)(B) is a "'quintessentially' discretionary decision," which we would review under the deferential abuse of discretion standard. (*Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.) Such an analysis, however, is not necessary for the resolution of this appeal.

placement of the child in his care, even though DPSS was prepared to place her with him, demonstrating stress about dealing with her care. Once the child was placed with him, father continued to have difficulty dealing with the child, and shortly thereafter relapsed, again leaving the child in the care of others. In other words, father arguably demonstrated he was incapable of functioning in the role of parent. In contrast, the prospective adoptive parents were meeting all of the child's needs, wanted to adopt her, and the child was thriving in their care. Nothing in the record compels the conclusion the child would be "greatly harmed" by severing a parent/child bond with father. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

In support of the contrary conclusion, father argues that the trial court abused its discretion by basing its findings in part on the assumption that there would be future contact between father and daughter, as well as extended family members. Father points to authority reversing juvenile court judgments where decisions to terminate parental rights were premised on expectation that the adoptive parent would voluntarily permit future contact. (See *In re C.B.* (2010) 190 Cal.App.4th 102, 128; *In re S.B.* (2008) 164 Cal.App.4th 289, 300.) In fact, however, the court's decision was not premised on such an expectation. Rather, the court first decided whether to terminate father's parental rights, balancing the benefits of the bond between the child and father (and, implicitly, the harm of severing the bond) with the benefits of adoption, as required under the case law discussed above. Then, separately, the court acknowledged that the prospective adoptive parents had previously expressed willingness to allow visitation between the child and her father, as well as extended relatives, as long as it was appropriate and

beneficial to her.  As such, no "closure visit" needed to be ordered, at least immediately.

The court asked DPSS to make sure the prospective adoptive parents understood that

postadoption visitation was allowed by the court "as long as it's safe for the child."  The

court's acknowledgment of post-termination circumstances, and making of appropriate

post-termination orders regarding visitation, does not equate to relying on an

"'unenforceable promise of future visitation by the child's prospective adoptive parents'"

in making the determination of whether to terminate parental rights.  (*In re C.B.*, *supra*, at

pp. 128-129 [quoting *In re S.B.*, *supra*, at p. 300].)  Father has demonstrated no abuse of

discretion.

## III. DISPOSITION

The trial court's order denying grandmother's section 388 petition and the

judgment terminating father's parental rights are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
Acting P. J.

We concur:

MCKINSTER
J.

KING
J.

19